**In the Matter of duPONT WALSTON INCORPORATED, f/k/a Walston & Co., Inc., Bankrupt.**

**Bankruptcy No. 74–B–344.**

United States Bankruptcy Court, S. D. New York.

March 31, 1981.

Hughes Hubbard & Reed, New York City, for trustee; James B. Kobak and Emelio Cueto, New York City, of counsel.

Nathan Krantman, Harrisburg, Pa., claimant.

OPINION

ROY BABITT, Bankruptcy Judge:

In the administration of the estate of this erstwhile Chapter XI debtor, now a bankrupt under the relevant provisions of the 1898 Bankruptcy Act,[1] the claimant, Nathan Krantman, originally filed a claim against the bankrupt's assets.[2] The claim was assigned No. 1458 on the claims register of this court maintained pursuant to Bankruptcy Rule 504(a), 411 U.S. 1055.

The trustee in bankruptcy seeks summary judgment for an order disallowing any claim. The trustee's motion is based upon his conclusion that said claim is not allowable because (1) it is not based upon a debt which may be proved within the meaning of Section 63a of the Bankruptcy Act, 11 U.S.C. (1976 ed.) § 103(a), and (2) it is unliquidated and contingent.

323 F.2d 566, 572 (4th Cir. 1963); *In re Cassidy*, 401 F.Supp. 757 (E.D.N.Y.1975).

1. The petition was filed under Chapter XI of the 1898 Act, Sections 301 *et seq.*, 11 U.S.C. (1976 ed.) §§ 701 *et seq.*, in 1974. The Chapter XI aborted two months later and bankruptcy administration followed. This dispute, is, therefore, governed by the provisions of the 1898 Act, Section 403(a) of Title IV of the 1978 bankruptcy legislation. Pub.L.No. 95–598, 92 Stat. 2549, 2683. See *Guardian Mortgage Investors v. Unofficial Noteholders, etc.*, 607 F.2d 1020 (2d Cir. 1979) at fn. 6.

2. The original claim, filed on July 3, 1978, was in the amount of $3,546.77. The facts of this dispute show that this represented the difference between the cost of the shares in question ($4,538.22), and the monies received from the sale of these securities ($1,288.83), and the accrued interest charges ($297.38). Subsequently, on November 20, 1978, claimant filed an amended claim with this court for $6,410.23, which represented the total loss sustained by claimant as a result of the involuntary liquidation of his account.

The trustee rests his case for disallowance on the premise that the claim was created and is grounded in the negligence of the bankrupt's employees, and as no action for such negligence had been commenced prior to the filing of the bankruptcy petition, claimant's right to recover damages as a result of the negligence is not a "debt which may be proved" within the meaning of Section 63(a) of the Bankruptcy Act. Non-provable debts are not allowable, i. e., not permitted to share in the assets of the estate.

The facts are these: on December 27, 1973, claimant telephoned Mr. Bernard Orbach (broker), his account executive at the duPont Walston branch office in Harrisburg, Pennsylvania, and placed a day order for 200 shares of Ponderosa Systems Common Stock (Ponderosa) at $44.75 per share. When claimant phoned again, later that afternoon, to inquire about the execution of his order, the broker informed him that the purchase of 100 shares was confirmed, but that the rest of the order could not be confirmed. The claimant then instructed the broker to notify him by the following day as to the status of the unfilled portion of his order and further, that if that portion (the second one hundred shares) had not yet been purchased, to cancel it.

The following afternoon, December 28, 1973, claimant again telephoned the broker and was informed by him that the second 100 shares had not been purchased. A few days later, claimant received a notice confirming the purchase of the second 100 shares of Ponderosa, which was then followed by a notice that this confirmation was cancelled. This left the claimant with the belief that he owned 100 shares of Ponderosa. When the Ponderosa stock dropped in price, on January 4, 1974, claimant sold what he assumed was his total portfolio of those shares, i. e., 100 shares at $38⅜ per share.

At the end of January, 1974, claimant received his monthly statement from the bankrupt and discovered that 100 shares of Ponderosa were still being carried in his margin account, whereupon he telephoned the broker seeking an explanation. The broker returned the call later that day and informed claimant that the entry on his January monthly statement was a clerical error and that a correction would appear on his next monthly statement.

The February, 1974 statement repeated the error and the claimant was again assured that the error would be corrected. It was about this time that the bankrupt's Harrisburg, Pennsylvania office was taken over by the firm of Dean Witter & Co. Claimant's first statement from Dean Witter & Co. failed to correct the disputed entry concerning the 100 shares of Ponderosa and when the claimant again telephoned the broker, now employed by Dean Witter & Co., he once again was assured there was an error and that a credit for both the Ponderosa shares and the interest charged to his account would appear on a forthcoming statement. The broker explained that the paperwork generated by the transfer of the branch office ownership probably accounted for the delay. About this time, claimant received an audit confirmation notice from the Dean Witter Company, requesting him to verify the accuracy of his account. Claimant returned this notice unsigned and appended an explanation of the error in his account.

The same error continued to appear on claimant's monthly statements for March, April, May and June, 1974, by which time claimant's "monthly protests" were lodged with the branch office manager, Mr. Alan Meminger, who continued to reassure him that the error would be corrected. During the latter part of April, 1974 and again during the early part of May, 1974, claimant received margin call notices from Dean Witter & Co. After each notice, claimant telephoned Meminger who told claimant to ignore the margin calls for, the latter said, the margin call notices were computer activated and since there was an error in claimant's margin account, the margin calls would not result in the liquidation of the securities in that account.

For the next eight weeks, claimant made various attempts to clear up this erroneous

transaction, including the transmittal of a certified letter to the New York office of Dean Witter & Co. (to which he never received a response), the placing of repeated telephone calls to Mr. Meminger, and, in addition, claimant also had some contact with the Securities Investors Protection Corporation (SIPC), all of which proved in vain.

On July 27, 1974, claimant received a notice from Dean Witter & Co. that all the securities in claimant's margin account had been liquidated. As a result of this liquidation, claimant incurred a total loss of $6,410.23, the amount of his amended claim.

On the facts just recounted, the question is put as to whether the claim is provable and therefore allowable within the meaning of Section 63(a) of the Bankruptcy Act, the section setting forth the contours of Congress' policy concerning the kinds of claims to be asserted in an 1898 Act bankruptcy case.

Within the guides described by the careful words Congress wrote, the law has long been settled that a claim based on entitlement to money damages resulting from an intentional tort by the bankrupt is neither provable nor allowable. *Schall v. Camors*, 251 U.S. 239, 251, 40 SCt. 135, 137, 64 L.Ed. 247 (1919). See also 3A *Collier on Bankruptcy* (14th ed.) ¶ 63.25. Similarly, a claim based upon the negligence of the bankrupt is also not provable and not allowable if no action for negligence had been instituted prior to and was pending at the time of the filing of the petition. If, however, such an action had been instituted, then the right to recover damages is a debt which could be proved under Section 63(a)(7), 11 U.S.C. (1976 ed.) § 103(a)(7).

While this may not seem equitable (at least to this innocent claimant), it nevertheless is the law. This dispute emphasizes that this court has been called upon not to determine equities but to construe Congressional enactment, processes which, unfortunately, do not necessarily lead to the same result. *Borgenicht v. Creditors' Committee*, 479 F.2d 150, 153 (2d Cir. 1973); *Haller v. Esperdy*, 397 F.2d 211 (2d Cir. 1968). None-

theless, some courts have looked for implied contracts underlying tort claims and where the bankrupt has derived some benefit have aided claimants on the theory of unjust enrichment. See, *e. g.*, *In re Paramount Publix Corp.*, 8 F.Supp. 644 (1934) and *Matter of Universal Research Laboratories, Inc.*, 627 F.2d 803 (7th Cir. 1980). Support has been found in Section 63(a)(4) authorizing debts founded upon implied contracts to be proved in the bankruptcy case.

Here, claimant's allegation of damages sustained is founded upon the mistakes and errors of the bankrupt's confirmation procedures. It is clear that the acts of the bankrupt were actionable for negligence, and since claimant had not instituted an action based on that negligence prior to the filing of the petition, his claim may not be proved as a matter of law.

Further, this court perceives no basis to convert the claim's non-provable status to a provable claim on some implied contract theory. Among other things, the bankrupt derived no benefit from its acts and was therefore not enriched at all, whether justly or unjustly. Finally, as this court said in an opinion in a dispute between this bankrupt and another claimant, filed on January 23, 1981, the attempted conversion of non-provable tort claims to claims based upon an implied contract theory solely to give the tort claim provable status "distorts Congress' scheme in Section 63(a) of the Act enumerating provable claims and the gloss given the statute by the cases holding tort claims to be non-provable." *Claim of FDIC as Receiver of United States National Bank.*

Accordingly, the trustee's objection to claim No. 1458 is sustained and the claim is stricken.